**CITY OF BRENHAM, Texas, Appellant,**

v.

**Russell HONERKAMP, Appellee.**

No. 03–96–00004–CV.

Court of Appeals of Texas, Austin.

Aug. 14, 1997.

Rehearing Overruled Oct. 2, 1997.

Anthony G. Brocato, Jr., Ludlum & Ludlum, Austin, for Appellant.

Stephen P. Webb, Webb & Webb, Austin, for Appellee.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

Appellee Russell Honerkamp sued appellant City of Brenham, Texas, for discharging him in violation of the Texas Whistleblower Act. *See* Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 610 (Tex. Gov't Code Ann. § 554.002, since amended) ("Act"). Following a trial to the jury, the court rendered judgment that Honerkamp recover actual and punitive damages, as well as costs, interest, and attorneys' fees. We will affirm the trial court's judgment.

From 1988 to 1993, Honerkamp worked for the City as environmental services manager. In this position, Honerkamp received assignments from the director of public works to complete special projects with staff members and departmental heads within the public works department. One of the departments that Honerkamp worked with throughout his tenure was the water treatment plant. Because the City had at times experienced problems maintaining the required level of chlorine in its water distribution system, many of Honerkamp's projects addressed chlorine levels. During the fall of 1991, friction developed when the new superintendent of the treatment plant resisted Honerkamp's advice on maintaining the required chlorine level in the water. Problems with the chlorine level recurred throughout 1992 and 1993, and Honerkamp increasingly came into conflict with people at the water plant over how to address these and other problems. The conflicts culminated on October 5, 1993, when the city manager informed Honerkamp that his employment with the City was terminated.

***Jury Question on Liability***

■ In point of error four, the City contends that the trial court erred in submitting to the jury a question and instruction inquiring whether Honerkamp was discharged for reporting "in good faith a possible violation of law."

The challenged question and instruction state:

Do you find from a preponderance of the evidence that the City of Brenham terminated Russell Honerkamp's employment for reporting in good faith a possible violation of law to an appropriate law enforcement authority?

To answer this question "Yes" you must find two things.

First, you must find that Russell Honerkamp reported in good faith a possible violation of the law. "Good faith" means that Russell Honerkamp had both a genuine desire to see that the law was followed and a reasonable belief that the law was not being followed.

. . . .

The City argues on appeal that the Act imposes liability only if Honerkamp believed that the law was actually, rather than possibly, violated and that the court's question and instruction lowered the standard for imposing liability on the City. The statute governing Honerkamp's retaliation claim states:

A state agency or local government may not suspend or terminate the employment of or discriminate against a public employee who in good faith reports a violation of law to an appropriate law enforcement authority.

Act § 554.002.

■ A person seeking to impose liability under the Act need not prove that a violation of law actually occurred. He must show instead that he reported conduct in good faith, meaning that he honestly believed the conduct violated the law and that a reasonable person in his circumstances would have so believed. *Wichita County v. Hart*, 917 S.W.2d 779, 784–85 (Tex.1996).[1] The trial court in this case defined good faith to mean

1. The supreme court rendered its decision in *Hart* after the City perfected its appeal in this case. 917 S.W.2d 779 (Tex.1996). In *Harris County Precinct Four Constable Department v. Grabowski*, 922 S.W.2d 954 (Tex.1996), however, the supreme court applied the standard of good faith announced in *Hart* even though the court of appeals had made its decision before *Hart* was decided. *Id.* at 955–56. We conclude that we are likewise bound by the definition of good faith articulated in *Hart*.

that "Honerkamp had both a genuine desire to see that the law was followed and a reasonable belief that the law was not being followed."

It appears that the trial court used the word "possible" in the charge to inform the jury that it must decide not whether the law was violated but whether Honerkamp believed that the law was violated. *See Melchi v. Burns Int'l Sec. Servs., Inc.*, 597 F.Supp. 575, 583 (E.D.Mich.1984) (statute prohibiting discharge for reporting a "suspected" violation of law protects an employee's subjective belief that he was reporting a violation). We think that a person reading the question in a common-sense manner would understand the words "possible violation" as expressing the requirement of good faith: because a plaintiff must report a violation in good faith, he need not report an actual violation of law; a violation that turns out not to exist, if reported under the honest, objectively reasonable belief that it does exist, suffices.

The trial court has broad discretion in submitting jury questions, subject only to the requirement that the submitted questions fairly place the disputed issues before the jury. *Varme v. Gordon*, 881 S.W.2d 877, 881 (Tex.App.—Houston [14th Dist.] 1994, writ denied). Because the question submitted here fairly placed the liability issue before the jury, we overrule point four.

In point of error five, the City asserts that the trial court erroneously refused to submit the liability question it proposed. Having determined that the trial court did not err in submitting the liability question, we overrule point five as well.

### Sufficiency of the Evidence To Show a Report

▮ The City contends in point of error three that factually insufficient evidence supports the jury's finding that the City terminated Honerkamp for reporting in good faith a possible violation of law to an appropriate law enforcement authority. The City focuses on the requirement that Honerkamp have made a report, arguing that in none of five

instances does sufficient evidence show that Honerkamp reported a violation. When reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence and reverse the judgment only if the evidence is too weak to support the judgment. *Plas–Tex v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

The City first asserts that evidence of Honerkamp's visit to the Texas Natural Resource Conservation Commission is insufficient to show that he reported a specific violation.[2] The City was required by state regulation to maintain at least 0.5 milligrams of chlorine per liter of water in its water distribution system. Tests Honerkamp performed in early 1992 showed that the water in some areas of the distribution system contained less than the required level of chlorine. One of these areas lay on the north side of town. During March and April 1992, Honerkamp recommended to superintendent Ed Stewart certain actions to increase the amount of chlorine in the drinking water leaving the plant. Stewart disagreed with Honerkamp's recommendations and declined to implement them.

Honerkamp understood the state's drinking water rules to require that the City maintain bacteria test sites in locations that were representative of drinking water conditions throughout the system. Honerkamp noted that some areas chronically low in chlorine had no bacteria test sites and concluded that the City's test sites were not representative. On April 17, 1992, Honerkamp traveled to Austin with Jeff Bodish, an operator in the treatment plant. The two met with Gordon Townsend and two other Commission employees. Honerkamp testified that he told Townsend at this meeting that he believed the City's bacteria test sites were not representative of the system. Honerkamp showed Townsend a map he had prepared showing the City's test sites and told Townsend about the areas of chronically low chlorine. Honerkamp discussed this trip

2. During Honerkamp's employment with the City, responsibilities relating to water quality at the Texas Department of Health were transferred to the Texas Water Commission, which was suc- ceeded by the Texas Natural Resource Conservation Commission. For simplicity, we will refer only to the Texas Natural Resource Conservation Commission.

at a meeting on May 27, 1992, with Janie Mehrens, the personnel manager, Leonard Addicks, then the city manager, and Kent Van Eman, Honerkamp's supervisor and at that time the public works director. Honerkamp described his actions at the Commission and the results of his meeting. He testified that Van Eman did not seem happy that Honerkamp had gone to Austin, judging by the tone of Van Eman's voice and by his statements contradicting Honerkamp. After explaining his actions, Honerkamp agreed to Addicks' request that in the future he inform Addicks before contacting a regulatory agency.

The City argues that Honerkamp's meeting with Townsend cannot have formed the basis of a whistleblower violation because Honerkamp neither reported specific violations to Townsend nor told his supervisor about the trip when he returned. Although some of Honerkamp's testimony about the subjects he discussed with Townsend was vague, Honerkamp specifically testified that he told Townsend his belief that the City's bacteria test sites were not representative. He testified in addition that he showed the map to Townsend and told him about the City's areas of low chlorine. Although Honerkamp responded negatively when asked if he told anyone at the City about his trip when he returned, he also testified that he discussed details of the trip at a meeting on May 27, 1992, with Van Eman, Addicks, and Mehrens. We determine that factually sufficient evidence shows that Honerkamp reported a violation to Townsend on April 17, 1992.

The City next argues that Honerkamp's testimony about questions he asked Townsend at a public meeting in Brenham fails to show that he stated his belief that any regulation had been violated. Because a citizen of Brenham had complained about the quality of the drinking water, the City appointed a committee of three people qualified to investigate the complaint. On July 26, 1993, the City held a public meeting attended by the committee and by five employees of the Commission, including Townsend. Honerkamp testified that he asked Townsend at the meeting whether Townsend had agreed at

their meeting in April 1992 that the Commission recommended placing a bacteria test site in an area of low chlorine. When Townsend replied negatively, Honerkamp asked what he would presently recommend for a system with no test site in an area of chronically low chlorine. Townsend confirmed that he recommended placing a test site there and further stated that he understood that the City already had a test site, designated number seventeen, in "that area." The evidence shows that, after their April 1992 meeting, Honerkamp had pursued the topic of representative test sites with Townsend by three letters in June and July 1992.

Although Honerkamp did not explicitly state at the public meeting that he believed the City's test sites were unrepresentative, Townsend recognized Honerkamp's questions as referring to his previous allegation that the test sites were unsuitable. The jury could infer that Townsend was familiar with Honerkamp's allegations about test sites not only from their April 1992 meeting, but also from Honerkamp's correspondence. The evidence of the exchange between Honerkamp and Townsend at the public meeting is factually sufficient to show that Honerkamp reported his belief that the City's bacteria test sites were not representative of its water distribution system.

Because factually sufficient evidence supports a finding that Honerkamp reported a violation of law on either April 17, 1992, or July 26, 1993, we need not consider the City's remaining arguments. We overrule point three.

### Other Challenges to the Jury Charge

In point of error nine, the City asserts that the trial court erred in instructing the jury that, to find the City liable, the report Honerkamp made must have formed "a motivating reason" for his termination. This instruction accompanied a question asking whether the preponderance of the evidence showed that the City terminated Honerkamp's employment for reporting in good faith a possible violation of law to an appropriate law enforcement agency. The challenged instruction reads: "You must find that the City of Brenham terminated Russell Honerkamp 'for reporting' a possible viola-

tion of law, meaning that the report was a motivating reason for the termination. The report does not have to be the sole reason, but it must be a motivating reason."

The City objected to the instruction, stating, "[A] motivating reason is not Texas Whistleblower law. The same thing with the last sentence that has 'motivated' [sic] reason." The City also tendered a proposed jury question that asked whether the City "terminated Russell Honerkamp's employment for in good faith reporting a violation of law to an appropriate law enforcement authority."

A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Tex.R. Civ. P. 274. The purpose of Rule 274 is to afford the trial court an opportunity to correct errors in the charge, by requiring objections both to clearly designate the error and to explain the grounds for the complaint. An objection that does not meet both requirements is properly overruled and does not preserve error on appeal. *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex.1986). Although the City complained of the phrase "a motivating reason," it did not explain why this phrase was incorrect. The trial court could not have known, from the City's objection, whether it should submit a sole-cause, but-for cause, or some other causation element. The City, therefore, waived its complaint as to the instruction. *Id.* at 277. Based on this waiver, we overrule point nine.[3]

Points of error six through eight concern the court's definition of good faith in the jury charge. In its sixth point of error, the City contends that the trial court erroneously defined good faith under the Whistleblower Act. During the charge conference, the City objected to the court's definition of good faith on the ground that "the definition given is not the law, according to Texas law." The City's objection neither pointed distinctly to the error complained of nor explained the

grounds of the City's complaint. *Castleberry*, 721 S.W.2d at 276. By failing to present its complaint to the trial court, the City has waived review on appeal. We overrule point six.

In point of error seven, the City contends that the trial court abused its discretion by refusing to submit the City's requested definition of good faith. The City requested the court to instruct the jury that

"good faith" in relation to "a good faith report of a violation of law" means (1) that the employee undertook to report the activities in the workplace in honesty and fact in concern rather than as a result of a motive such as malice, spite, jealousy, or personal gain *and* (2) the employee had a reasonable basis to believe that the activities reported were a violation of law *and* (3) the employee did not undertake the report for the purpose of being terminated or to induce retaliation by the employer.

In *Hart*, 917 S.W.2d at 784, the supreme court defined good faith under the Whistleblower Act to mean that (1) the employee believed that the conduct reported was a violation of law and (2) the employee's belief was reasonable in light of the employee's training and experience. The court specifically declined to incorporate the absence of malice into good faith, stating that an employee's malice should not negate the Act's protection if the employee's report of a violation of law was honestly believed and objectively reasonable. *Id.* at 786.

The City's requested definition includes the element rejected by the court in *Hart*, namely, the employee's motive. Because the instruction is an incorrect statement of the law, the trial court did not err in refusing to submit it. Tex.R. Civ. P. 278. We overrule point seven.

In its eighth point of error, the City contends that the trial court erred in refusing to submit the instruction it tendered on

---

3. During the trial of this cause, and before objections were made to the charge, the supreme court defined the standard of causation in Whistleblower Act cases and formulated the appropriate jury instruction. *See Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636–37 (Tex.

1995). On appeal, the City urges that the trial court's instruction was incorrect in light of *Hinds*. Because the City failed to preserve error on this point, we need not consider whether *Hinds* applies to causes that arose before that decision was rendered.

good faith. The City proposed in writing that the court instruct the jury as follows:

> In connection to Jury Question Nos. One and Two, you are instructed that an employee does not act in good faith when the employee reports an alleged violation of law about a condition which he created or caused. Furthermore, you are instructed that an employee does not act in good faith when the employee reports an alleged violation of law about a condition for which he is responsible which he cause [sic] by conscious indifference or he allowed to happen.

The supreme court wrote at length in *Hart* on the factors that comprise good faith in a Whistleblower action. *See Hart*, 917 S.W.2d at 784–86. The factors it elaborated are exhaustive; the court did not leave its definition open to factors that may be added based on evidence in a particular case. Because the City tendered an instruction on good faith that incorrectly required the employee to be free of involvement in the alleged violation, the trial court correctly rejected it. We overrule point eight.

■ In its tenth point of error, the City argues that the trial court erroneously refused to submit its requested definition of law. The City tendered the following definition:

> In connection with Jury Question Nos. One and Two, you are instructed that the term "law" in relation to "a good faith report of a violation of law" means (1) a state or federal statute; or (2) an ordinance of a local governmental body; or (3) a rule adopted under a statute or ordinance, any of which represents corrupt, illegal, fraudulent or harmful activities.

> You are instructed that a violation of law does not include any report which has already been determined by an appropriate law enforcement authority not to be a violation of law prior to the report.

The trial court is required to submit such definitions as shall be proper to enable the jury to render a verdict. Tex.R. Civ. P. 277. The second sentence of the proposed definition is confusing and, even when understood, unnecessary to help the jury render a ver-

dict. In addition, definitions of words used in their usual and ordinary sense are not generally considered necessary to help the jury render a verdict. Only words used in a technical sense require special definition. *Magnolia Petroleum Co. v. Long*, 126 Tex. 195, 86 S.W.2d 450, 455 (1935); *Pena v. Ludwig*, 766 S.W.2d 298, 305 (Tex.App.—Waco 1989, no writ). The Whistleblower Act defines law, and the first sentence of the City's proposed definition, without the last clause, tracks the Act's definition. *See* Act § 554.001(1). The word "law" in the Act, however, is not used in a special or technical sense, and the trial court was not required to define it. We therefore overrule point ten.

■ In its eleventh point of error, the City asserts that the trial court erroneously refused to submit the instruction it requested relating to an appropriate law enforcement authority. The City requested the court to instruct the jury, "In connection to Jury Question No. One, you are instructed that an employee' [sic] statements at a public meeting do not constitute any reports in good faith of violations of law, even if an appropriate law enforcement authority is present." The City relies on *City of Beaumont v. Bouillion* to support its request. 896 S.W.2d 143, 145 (Tex.1995). In *Bouillion*, the supreme court held that the media is not an appropriate law enforcement authority under the Act. *Id.* The court did not address statements made at a public meeting, and nothing in the Act excludes such statements from constituting a report of a violation of law. Because the City's requested instruction incorrectly states the law, we overrule point eleven.

■ In point of error twelve, the City asserts that the trial court erred in failing to define "an appropriate law enforcement authority." The City tendered the following definition:

> In connection to Jury Question Nos. One and Two, you are instructed that the term "an appropriate law enforcement authority" in relation to "a good faith report of a violation of law to an appropriate law enforcement authority" means an official who has the power and duty under the law to decide disputes concerning the lawfulness

of the matter being reported, the power and duty to order a halt or change in the matter reported, the power to legislate or regulate with respect thereto, or the power to arrest, prosecute or otherwise discipline on account of an alleged violation being reported.

While the City's proposed definition may not be incorrect, we determine that the phrase "an appropriate law enforcement authority" has no special, technical meaning apart from its ordinary meaning. *See City of Dallas v. Moreau*, 697 S.W.2d 472, 474 (Tex. App.—Dallas 1985, no writ) (defining an appropriate law enforcement authority); *Travis County v. Colunga*, 753 S.W.2d 716, 719–20 (Tex.App.—Austin 1988, writ denied). The trial court acted within its discretion in refusing this definition. Even if the trial court erred, the City has failed to show harm: the City claims that, because Honerkamp failed to show that Stewart possessed binding authority, Stewart was not an appropriate law enforcement authority; Stewart's position as superintendent of the treatment plant, however, implies his authority to investigate the lawfulness of questioned conduct and to cause its cessation. We overrule point eleven.

In point of error seventeen, the City contends that the trial court erred in refusing to submit its requested definition of "resulted from" relating to the question on damages. The court asked the jury concerning damages, "What sum of money, if paid now in cash, would fairly and reasonably compensate Russell Honerkamp for his damages, if any, that resulted from the termination of his employment with the City of Brenham?" The City tendered a definition that stated, "In connection with Jury Question No. Two, you are instructed that the term 'resulted from' means that the act that resulted from a particular event was the cause of it and without said cause the result would never have occurred." The City worded its request illogically, thereby failing to present a substantially correct definition. *See* Tex.R. Civ. P. 278. Further, proximate cause is the incorrect standard for determining damages caused by a wrongful termination. *Texas Dep't of Human Servs. v.*

*Green*, 855 S.W.2d 136, 150, (Tex.App.—Austin 1993, writ denied), *disapproved on other grounds, Hinds*, 904 S.W.2d at 634–35. We therefore overrule point seventeen.

The City argues in its eighteenth point of error that the trial court erroneously refused to submit its requested definition of "mental anguish." The trial court submitted the following definition: " 'Mental anguish' means emotional pain and suffering. Mental anguish is more than mere disappointment, anger, resentment, or embarrassment, although it may include all three." The City requested the following definition:

> In connection to Jury Question No. Two, you are instructed that the term "mental anguish" implies more that [sic] mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions and [sic] grief, severe disappointment, indignation, wounded pride, shame, despair, and/or public humiliation.

The City's requested definition differs from that submitted only in its elaboration of specific mental sensations included in mental anguish. *See Trevino v. Southwestern Bell*, 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ). The trial court's definition, while more concise, does not misstate the law and was proper. We overrule point eighteen.

### Failure To Timely Supplement

In points of error one and two, the City argues that the trial court erred, both at a pre-trial hearing and during trial, in ruling that three expert witnesses and one fact witness could testify despite Honerkamp's failure to supplement interrogatories timely. As to the pre-trial hearing, the City contends that the trial court erroneously found good cause to allow the witnesses to testify. When a party fails to supplement responses to discovery timely, he will not be allowed to present evidence that he should have provided unless the trial court finds good cause sufficient to require admission. Tex.R. Civ. P. 215(5). The burden of establishing good cause is on the party offering the evidence, and good cause must be shown in the record.

*Id.* In arguing that the trial court erroneously found good cause at the pre-trial hearing, the City relies on a transcription of the hearing that is included in the clerk's transcript of this cause. This transcription of the hearing does not qualify as a statement of facts that we can consider on appeal. *Smith v. Grace,* 919 S.W.2d 673, 677 (Tex.App.—Dallas 1996, writ denied). *See* Tex.R.App. P. 50(c), 53(h), (i). Without a complete record showing the basis for the trial court's finding of good cause, we cannot conclude that the trial court erred in making its finding and allowing the testimony. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 689 (Tex.1990). We, therefore, overrule point one.

At trial, presided over by a different judge, the City reurged its contentions. The trial court again ruled that the witnesses could testify. In making its ruling, the trial court stated that she had carefully reviewed the transcription of the pre-trial hearing, that the judge had dealt with the issues, and that the judge had made a record that was clear as to his rulings. Because the court relied on the transcription of the pre-trial hearing in allowing the witnesses to testify and we are without this part of the record, we lack a complete record to review. The court further stated that the earlier order did not oblige Honerkamp to make additional supplementation and that any supplementation he made after the order could not have prejudiced the City. After reading the order, we agree with the court's assessment. We overrule point two.

### Exhaustion of Administrative Remedies

■ The City combines its argument on points of error thirteen and fourteen, which address exhaustion of administrative remedies. In its thirteenth point of error, the City argues that the trial court erred in refusing to ask the jury whether Honerkamp exhausted his administrative remedies before suing the City. Honerkamp was required to exhaust the City's grievance procedures relating to employment termination before filing his whistleblower suit, and the City pleaded his failure to do so as an affirmative defense. Act § 554.007(a). The City tendered the following jury question:

Do you find from a preponderance of the evidence that, before filing this lawsuit, Russell Honerkamp completed all of the City of Brenham's grievance or appeal procedures relating to his claim that he was discharged for reporting in good faith violations of law?

■ The City argues that the court should have submitted its question because the evidence shows conclusively that Honerkamp did not complete the grievance process. A proposition conclusively established by the evidence should not be submitted to the fact finder. *T.A. Manning & Sons v. Ken–Tex Oil Corp.,* 418 S.W.2d 324, 326 (Tex.Civ. App.—Austin 1967, writ ref'd n.r.e.). The City's argument aside, however, we determine that the proposed question is not substantially correct. *See* Tex.R. Civ. P. 278. First, asking whether a preponderance of the evidence shows that Honerkamp completed the grievance process appears to erroneously place the burden on Honerkamp to prove compliance rather than on the City to prove its affirmative defense of failure to comply. *See Lifestyle Energy Corp. v. John Wilson Drilling Co.,* 611 S.W.2d 709, 710 (Tex.Civ. App.—El Paso 1980, no writ). Second, the question poses an issue of mixed fact and law without an instruction to guide the jury. The Brenham City Charter states that before the City will be liable for damages of any kind, the person injured must give the mayor or council members written notice of the injury, stating when and how the injury occurred and the extent of it. Interpreting this provision to be part of a grievance procedure and interpreting the phrase "how the injury occurred" to require notice that Honerkamp believed he was discharged in violation of a specific statute both involve legal questions on which the jury should be instructed. *See, e.g., Island Recreational Dev. Corp. v. Republic of Tex. Savs. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). The City was, therefore, not entitled to its requested question. We overrule point thirteen.

The City contends in its fourteenth point of error that, because it conclusively proved that Honerkamp failed to exhaust his administrative remedies, the trial court erroneously denied it a directed verdict and a judgment

notwithstanding the verdict. The trial court should grant a directed verdict or a judgment notwithstanding the verdict when reasonable minds can draw only one conclusion from the evidence. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). The City specifically contends that Honerkamp failed to comply with the City Charter's requirement that he notify the City Council that he was terminated in violation of the Whistleblower Act.

Assuming that Honerkamp was required to give such notice, the record shows that he did. Honerkamp initiated the grievance process soon after the City discharged him, and the City Council heard his grievance on November 2, 1993. On November 1, 1993, Honerkamp wrote a letter to the mayor and council members in connection with his grievance. He recounts in this letter his visit to the Commission and states that he believes the City terminated his employment because he contacted a regulatory agency without prior notice to his supervisors. Because some evidence exists that Honerkamp notified the Council of his belief that he was discharged in violation of the Act, the trial court properly refused to grant a directed verdict and a judgment notwithstanding the verdict. We overrule point fourteen.

### Malice and Exemplary Damages

■ The City argues in point of error fifteen that the evidence is legally and factually insufficient to support the jury's finding of malice. The trial court asked the jury whether it found that the City terminated Honerkamp's employment with malice. The court defined malice to mean "with a specific intent to cause substantial damage or with a flagrant disregard for the rights of others and with actual awareness that the act will in reasonable probability result in substantial damage." We review the City's no-evidence challenge by considering only the evidence and inferences that tend to support the finding and disregarding any evidence and inferences to the contrary. *Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 593 (Tex.1986), *cert. denied,* 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If any probative evidence supports the finding, it must be

upheld. *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989).

Honerkamp testified that following his April 1992 trip to Austin, the Commission inspected the City's water distribution system. Honerkamp participated in a post-inspection meeting at which a problem of low chlorine was addressed. After this meeting, Van Eman gave Honerkamp a written performance evaluation in which he rated Honerkamp significantly lower than he had in the past. Van Eman noted on the evaluation form that Honerkamp had difficulty being a team player, especially when other personalities were involved, and that Honerkamp had expressed concerns about management decisions that Honerkamp believed were not in the City's best interest. Van Eman wrote that although Honerkamp might not agree with decisions, it was important to understand that the City had designated certain individuals to be responsible for making those decisions.

As mentioned earlier, Honerkamp discussed his trip to the Commission at a meeting on May 27, 1992, with Addicks, Van Eman, and Mehrens. Honerkamp testified that Van Eman seemed unhappy with his description of the trip and that Addicks asked Honerkamp to tell him before he contacted a regulatory agency in the future.

At a city council meeting on July 15, 1993, a citizen of Brenham, Jeri Budell, voiced her concern that the city's drinking water had caused her to suffer recurrent stomach illnesses. She requested the council to investigate her concerns. Budell stated that a former City employee had reported problems concerning the water treatment plant to the Commission. She asserted that the Commission had on file all the complaints about the City's water quality. Van Eman, who was at that time city manager, confirmed that the Commission had a large volume of correspondence from the City, some from a past city employee and some from a present employee; he complained that he had not received copies of any of the letters. The City's minutes of the meeting recite that Budell claimed City employees would not come forward with their complaints about water

treatment because they feared management interference.

Van Eman stated at the July 1993 meeting that he was not even remotely concerned about the quality or the treatment of the water in the system. He said that, as a result of the past employee's complaint to the Commission, the Commission immediately inspected the City's water treatment plant and found no problems. In a letter to the City in July 1992, however, the Commission lists seven violations of state rules or regulations its employees uncovered during the same inspection, one of which concerned low chlorine in the system. Van Eman asked the council members how they would feel if he, having a legitimate concern that council members conduct open meetings, went to the attorney general's office and complained about the meetings without telling them. One member responded, "You'd probably be fired," after which Van Eman remarked, "Okay, that's all I wanted to know."

Stewart testified that, shortly before the city meeting attended by the special committee, Ron Bottoms, the director of public works, told Stewart that Honerkamp was going to be fired. This meeting occurred July 26, 1993.

The surface water treatment rule went into effect on July 1, 1993. It required the City to collect water samples and submit monthly operating reports to the Commission showing that no more than five percent of its samples were low in chlorine. If more than five percent of samples were below the minimum level of chlorine for two months, the rule required the City to notify its customers. On August 27, 1993, John Reno, an operator at the plant, noticed that the data for July showed more than five percent of the samples deficient in chlorine and suggested that the plant would almost certainly exceed five percent again in August.

Reno notified Bottoms, who exclaimed, "You mean we just had a public hearing where we told everybody there was no problem with the water, and we have major problems?" Reno answered, "Yes." Bottoms then approved Stewart's suggestion that the City add 200 samples drawn at the treatment plant to the data for July and August; with

these additional samples, the deficient samples no longer exceeded five percent. The odds of water at the plant containing low chlorine were minimal compared to water further away in the distribution system. On August 30, Bottoms explained to the Commission that the July monthly operating report might have been inaccurate and that the City might have had a problem with low chlorine that month. The July and August reports were both revised later at the Commission.

By memo dated October 5, 1993, Van Eman notified Honerkamp of his termination. Van Eman attached Bottoms' memo, in which Bottoms mentioned that Honerkamp reported to the city attorney that the water treatment plant was not in compliance with the new surface water treatment rule and suggested he notify the public. Bottoms asked what business Honerkamp had reporting the plant's noncompliance and stated that he was "sick and tired of this man's hidden agenda." He concluded that Honerkamp was not a "team player" and could not be trusted due to his harbored agenda. Bottoms recommended hiring a new employee to replace Honerkamp.

One issue Honerkamp had raised with the city attorney was the City's violation of the rule that it install a continuous chlorine monitor by a date certain. Honerkamp told the city attorney that the City was accordingly required to notify the public of its violation. Bottoms testified that, on October 5, 1993, he intended to avoid notifying the public of the violation by seeking a waiver of the public notice requirement.

Evidence that City officials resented Honerkamp's reports to the Commission and misrepresented to the public the deficiencies uncovered as a result of those reports, and that the City discharged Honerkamp for working to ensure compliance with water quality regulations, while trying to avoid notifying the public and the Commission of its lack of compliance, is some evidence of the City's flagrant disregard for Honerkamp's rights. Further, the City's knowledge that its action would cause Honerkamp to be unemployed shows actual awareness that the

act would result in substantial damage. A review of all the evidence shows testimony offered by the City that it discharged Honerkamp for valid reasons, such as Honerkamp's failure to complete certain tasks, his abrasive manner with co-workers and superiors, his caustic memos, and his calling the city attorney "Pinocchio" and "Ned Racine."[4] We believe, however, that the entirety of the evidence is also factually sufficient to show that the City acted with malice in terminating Honerkamp. *E.g., Wichita County v. Hart,* 892 S.W.2d 912, 925–26 (Tex.App.—Austin 1994), *rev'd on other grounds,* 917 S.W.2d 779 (Tex.1996). We therefore overrule point fifteen.

■ In point of error sixteen, the City attacks the legal and factual sufficiency of the evidence to support the jury's award of $750,000 in exemplary damages. To award exemplary damages under the Act, a jury must first find that the defendant acted with malice. *City of Ingleside v. Kneuper,* 768 S.W.2d 451, 456–57 (Tex.App.—Austin 1989, writ denied). To review such an award, we must assess the evidence in light of five factors: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994); *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981).

We assess the nature of the wrong in light of the purposes underlying the Whistleblower Act; these are (1) to protect public employees from retaliation by their employer when, in good faith, the employee reports a violation of law, and (2) to secure in consequence lawful conduct on the part of those who direct and conduct the affairs of public bodies. *Colunga,* 753 S.W.2d at 718–19. Rather than resulting in improvement, Honerkamp's efforts to secure lawful conduct in the City's water treatment operations caused City officials to act in resentfulness and retaliation toward him. We have previously detailed the degree to which the City acted

with malice toward Honerkamp, especially in light of the City's duplicity toward the public about its compliance with water treatment regulations that Honerkamp had questioned. The degree of blameworthiness of the City's conduct is exacerbated by the fact that in choosing to retaliate against Honerkamp, rather than to improve its water treatment operations, the City put at risk the health of citizens drinking its water.

In this employment context, the relative situations of the City and Honerkamp were unequal: while Honerkamp could recommend changes to the City's water treatment, he could not implement them; the City possessed the power to enforce changes in operations and the power, though wrongful, to retaliate against employees who tried to bring about changes in ways it disliked. The jury legitimately sought to punish the City for abusing its power to retaliate. The sensibilities of the parties toward their obligations in this case are also clear. Honerkamp took his responsibility to monitor compliance with regulations seriously, while the City did not live up to its responsibilities to comply with the same regulations. The City's flagrant disregard for Honerkamp's rights and its lack of candor with the citizens it purported to serve, along with the possible health risks its actions entailed, seriously offend a public sense of justice and propriety. We cannot say that the jury acted unreasonably by punishing the City in the amount of $750,000. Because the evidence is legally and factually sufficient to support the award, we overrule point sixteen.

### Damages for Mental Anguish

■ In point of error nineteen, the City asserts that the evidence is legally and factually insufficient to support the jury's award of $135,000 for past mental anguish. As mentioned, the court provided the following definition of mental anguish for the jury: " 'Mental anguish' means emotional pain and suffering. Mental anguish is more than mere disappointment, anger, resentment, or embarrassment, although it may include all three."

4. Ned Racine is a dishonest southern lawyer in the movie *Body Heat.*

Honerkamp testified that he was devastated by the City Council's decision to uphold his termination. He was unable to clear his name with the City and believed that the things that were said about him hurt his professional reputation. Honerkamp stated that his self-image was closely connected to his job and that he valued the good evaluations his work had earned him throughout his career. The importance of his job with the City led him to spend much time working; in his spare time, he read technical articles about the water industry to learn more about it. Because succeeding at work was so important, the termination hurt him deeply.

Brenham was Honerkamp's home town, many people had known him for years, and he had enjoyed a good reputation in the community. Honerkamp testified that he valued his reputation for integrity. After the termination, people asked him questions and said damaging things about him. He felt that the City's charges against him had besmirched his personal as well as his professional reputation in the community.

The termination also affected Honerkamp's close personal relationships. The things people said about him caused problems within the family. Honerkamp thought that the firing affected how his father felt about him and that his father wanted him to be able to restore his reputation in the community. Honerkamp's inability to find work strained the family's resources so that he could not provide as well for his wife and two stepsons, Warren and Sherman. Honerkamp testified that he felt in some way responsible for the death of his older stepson Warren, who left home partly because of the ridicule he received at school about the family's financial difficulties and the allegations of misconduct against Honerkamp. Honerkamp believed that, had Warren remained in their care, he would not have been in the place he was when he was run over and killed. Warren's death caused Honerkamp to wonder if he had been right to act according to his principles.

In opposition to this evidence, testimony was presented that events other than Honerkamp's termination could have caused him mental anguish. These included his father's death in December 1994 and a court order in a custody case that barred his wife from speaking to Sherman from April 1991 until December 1992. Warren's death in June 1994 was, independent of its cause, also a source of grief.

The evidence shows that the City's termination caused Honerkamp to experience public shame and humiliation, both personally and professionally, as well as grief over any responsibility he may have had for Warren's death. We conclude that the evidence is legally and factually sufficient to support the jury's award for mental anguish suffered in the past. We overrule point nineteen.

### Damages for Loss of Future Earning Capacity

 In point of error twenty, the City contends that the award of $140,000 for loss of future earning capacity lacks any evidence to support it. The trial court defined loss of earning capacity as "the loss of the ability to earn similar income in a similar job."

Honerkamp had earned a degree in chemical engineering with honors from the University of Texas and was paid $18,000 a year when he began working for the City in May 1988. When the City terminated him in October 1993, he was earning $38,718 a year. Honerkamp was forty-four at the time of trial and stated that he had hoped to work for the City until retirement, perhaps consulting for the City afterward. In view of his termination, Honerkamp did not believe that he would ever be able to work for the City.

Honerkamp testified that he subsequently sought employment at three engineering firms in Brenham. Honerkamp discussed with John Pledger, a principal of the first firm he contacted, what had happened at the City; Pledger made clear during this conversation that it would be difficult for the firm to hire him under the circumstances. Alton Rogers, with Rogers Engineering Services, told Honerkamp that he appreciated the difficult situation Honerkamp was in, but that it would be hard for him to hire Honerkamp because the firm did a lot of work for the City and he could not afford to lose the City as a client. Honerkamp believed that the City's firing him had damaged his professional reputation. He testified that because of

the close ties among the engineering firms he had applied to and their relationships with the City, the termination had hurt his chances with all potential employers in and around Brenham.

Honerkamp also testified that he applied for jobs in neighboring cities, such as College Station, Industry and Somerville, without success. The job at Somerville paid approximately $20,000 while the job at College Station paid $26,000 to $28,000. He asked his former supervisor at Radian in Austin if a position was available. Honerkamp stated that people's comments about the reason for his termination hurt his attempts to find employment close to Brenham. He testified that the city attorney had asked the Texas Employment Commission where Honerkamp was applying and that, in his opinion, the city attorney was trying to hurt his chances of getting a job at those places. Since his termination, Honerkamp has worked at a variety of odd jobs, from which he probably earned less than $10,000 a year.

Honerkamp's testimony shows that he cannot expect to work for the City, that engineering work is not currently available in Brenham, and that he has been hindered in finding a suitable job in the surrounding area. Although Honerkamp may eventually find a job outside Brenham, he will likely start over at a lower salary, as indicated by the jobs for which he had applied. Given the time it may take Honerkamp to find a job using his skills and, due to starting at a lower salary, his foregone salary and future increases from the City, the jury could reasonably have inferred that $140,000 would compensate Honerkamp for his loss of future earning capacity. Because some evidence supports the jury's award, we overrule point twenty.

### Bar to Damages

■ In points of error twenty-one and twenty-two, the City argues that a pre-trial order limits Honerkamp to recovering $50,-025 in lost wages and $50,589.30 in attorneys' fees. The jury awarded Honerkamp $70,918 for lost earning capacity in the past and $130,000 for attorneys' fees through trial.[5]

The trial court disregarded $14,702.20 of the attorneys' fees, rendering judgment for $115,297.80. In its interrogatories, the City asked Honerkamp to "state in full detail and itemize in dollars and cents all special and other damages for each category of damages for which you will seek recovery." Honerkamp moved before trial to supplement his answers to provide that he would seek $50,-025 in lost wages to date and $50,589.30 in attorneys' fees to date. After a hearing, the trial court signed an order stating that "with respect to damages, Plaintiff will be limited to the presentation of damages that are listed in his response to Defendant's Interrogatory No. 5."

Whether the order limits only the types of damages Honerkamp can present or limits both the types and the amounts of damages is unclear. When an order is ambiguous, the balance of the record may be consulted to aid in construing it. *Permian Oil Co. v. Smith*, 129 Tex. 413, 107 S.W.2d 564, 567 (1937). In this case, the transcription of the hearing leading to the order is not before us. We presume that the missing portion of the record supports the trial court's judgment. *De-Santis*, 793 S.W.2d at 689. We therefore overrule points twenty-one and twenty-two.

### Admission of Evidence

■ The City claims in point of error twenty-three that the trial court erred in admitting evidence, from Van Eman and through a tape recording of the city council's meeting on July 15, 1993, of a council member's response to Van Eman's hypothetical question. At the July 15 meeting, Van Eman asked the council members how they would feel if he went to the attorney general's office and complained about how the council conducted open meetings without telling them. A council member answered, "You'd probably be fired," following which Van Eman stated, "That's all I wanted to know." The City complains that the council member's response was so prejudicial as to prevent a just verdict.

The council member's answer was inseparable from Van Eman's question and re-

---

5. Although we note the distinction between lost past wages and lost past earning capacity, the City complains only that the amount of lost past wages is erroneous.

sponse, all of which illuminated Van Eman's attitude toward a City employee who reported a violation of law to an authority. Given the relevance of such an attitude to this case, we hold that the trial court acted within its discretion in admitting the evidence. *See* Tex.R. Civ. Evid. 401. We overrule point twenty-three.

In point of error twenty-four, the City challenges the admission of Ron Bottoms' testimony that the City enhanced its monthly reports to the Commission by adding 200 water samples drawn at the water treatment plant. Bottoms testified that in July and August 1993, the City added these samples to keep the July and August monthly operating reports from showing that more than five percent of the City's distribution samples contained less than the minimum amount of chlorine. The City objected at trial that Bottoms' statements were irrelevant and immaterial. We determine that the testimony shows the City's attitude toward its responsibility to comply with water treatment regulations and is therefore relevant to the issues of malice and punitive damages. We overrule point twenty-four.

In point of error twenty-five, the City contends that the combination of errors committed by the trial court caused the rendition of an improper judgment. Because we have determined that no error exists, we overrule point twenty-five.

## Conclusion

Having considered and overruled each of the City's points of error, we affirm the judgment of the trial court.