**TEXAS NATURAL RESOURCE CONSERVATION COMMISSION, Appellant,**

v.

**Thomas P. McDILL, Jr., Appellee.**

No. 03–95–00196–CV.

Court of Appeals of Texas, Austin.

Jan. 24, 1996.

Dan Morales, Attorney General, Mary Taylor Henderson, Assistant Attorney General, General Litigation Division, Austin, for appellant.

B. Craig Deats, Jenkins & Deats, P.C., Austin, for appellee.

Before CARROLL, C.J., and JONES and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

Thomas McDill brought suit against the Texas Natural Resource Conservation Commission (the "TNRCC") alleging discrimination in violation of the Whistleblower Act ("the Act"). *See* Tex.Gov't Code Ann. §§ 554.001–.010 (West 1994 & Supp.1996).[1] Following a jury trial and verdict in favor of McDill, the trial court rendered judgment awarding McDill $59,738 for lost earnings, $5,000 mental anguish damages, $746,025 exemplary damages, and $142,000 attorney's fees, including additional amounts in the event of an unsuccessful appeal. The TNRCC brings numerous attacks against the judgment, including the allegation that the trial court erred by refusing to submit a proposed jury instruction. The instruction would have required the jury to find a "but for" causal link between McDill's reports of wrongdoing and his termination. Because we conclude that the failure to submit this instruction was error and that it probably resulted in the rendition of an improper

1. When appellee initiated this lawsuit in 1993, the Act was found at Texas Revised Civil Statutes article 6252–16a. The cause of action is governed by the law in effect at that time. Because the recodification of the statute and subsequent changes to it have no substantive impact on the issues relevant to our analysis, we cite the current Code provisions for the sake of convenience. *See* Act of Apr. 30, 1993, 73d Leg., R.S., ch. 268, §§ 46(1), 47, 1993 Tex.Gen.Laws 583, 986; Act of May 25, 1995, 74th Leg., R.S., ch. 721, § 11, 1995 Tex.Gen.Laws 3812, 3814–15.

judgment, we will reverse the judgment of the trial court.

### Background

McDill, a licensed professional engineer, began work in July 1990 at the Texas Department of Health. McDill worked in the Permit Section of the Municipal Solid Waste Division, reviewing and processing permit applications submitted by companies planning to operate solid waste disposal facilities in Texas. In 1992, the Municipal Solid Waste Division moved from the Health Department and became part of the Texas Water Commission (the "TWC").[2] McDill's responsibilities in the Permit Section of the Division remained the same at the TWC. In March 1993, McDill was terminated.

In his lawsuit, McDill claimed he was fired for reporting two alleged acts of wrongdoing which occurred within his Division: (1) the promotion of an unqualified employee, Mary Adrian, contrary to TWC rules, and (2) the failure of McDill's supervisors to report, as required by law, the forgery of an engineer's seal. TNRCC maintained that McDill lost his job for committing acts of gross ethical misconduct. A full understanding of these contentions requires a brief history of the intertwined events leading up to them.

In September 1992, a vacancy announcement was posted in the Municipal Solid Waste Division for the position of Permit Section Chief; the announcement listed the minimum qualifications necessary for the job. McDill and roughly five others interviewed for the job before a three-member panel. The panel unanimously selected Mary Adrian for the position, and she assumed her new responsibilities in November 1992.

As Chief, Adrian worked under the supervision of Ronald Bond, who was Director of the Municipal Solid Waste Division. Adrian, whose duties included supervising McDill, became concerned with McDill's work hours and punctuality during November. On December 10, 1992, Adrian interviewed McDill for a "team leader" position within the Permit Section. Shortly after the interview, Adrian called McDill to a second meeting to voice her concerns over his work schedule. Bond also attended the meeting to reprimand McDill for a complaint filed by the City of Brenham in August 1992 ("the Brenham complaint"), alleging that McDill had scheduled a site inspection on a city holiday and had then shown up four hours late for the inspection.

McDill testified he first became concerned with Adrian's qualifications for Permit Section Chief after asking questions about her experience during the team leader interview. He claimed that Adrian's conduct during the later reprimand meeting led him to believe she had little experience dealing with professionals. McDill believed that neither Bond nor Adrian had reviewed the Brenham project file before his reprimand, and testified that they were not interested in hearing his response to the allegations. Bond and Adrian both claimed that McDill was belligerent and unprofessional during the meeting.

After the meeting, McDill reviewed a copy of Adrian's resume to compare her qualifications with those requirements listed on the vacancy announcement. According to McDill, her resume reflected about two years' managerial experience with professionals and technicians, while the vacancy announcement listed a minimum requirement of five to eight years' experience in managing technical and professional personnel. On December 21, 1992, McDill met with Adrian to bring an informal grievance over her hiring. McDill testified he told Adrian that he believed she lacked the minimum experience for her position. According to Adrian, McDill told her at the meeting that he would file a grievance against her for failing to warn him about his tardiness prior to reprimanding him. Adrian claimed McDill was again obnoxious and belligerent, an allegation McDill denied. The two met for a second time on January 4, 1993, and each provide a similar account of the second meeting.

Two days later Adrian met with Pete Garcia in Human Resources to discuss possible grounds for McDill's termination. She presented Garcia with a draft memo outlining the Brenham complaint and a second com-

---

2. After McDill was terminated, the TWC became part of the TNRCC.

plaint against McDill made by Dick Dunham ("the Dunham complaint"), alleging that McDill asked Dunham to submit a letter of commendation for McDill and threatened to hold up Dunham's permit application if he failed to do so. Adrian testified that based on these complaints and other minor instances of misconduct, she decided it was time to terminate McDill. Garcia informed her that she did not have enough evidence to fire McDill based on the allegations outlined in the memo.

On January 7, Adrian received McDill's written grievance concerning her job qualifications. The grievance complained generally of management practices, of McDill's reprimand without prior warning, and of an "inexperienced manager" (Adrian) whose hiring did not conform to TWC rules.[3] The grievance concluded in part that Adrian's hiring should be set aside and the position readvertised to assure a Chief with appropriate minimum qualifications. In Adrian's response of January 11, she advised that McDill had not made clear which agency rules were allegedly violated, and that his submission as written did not qualify as a grievance under agency operating procedures. McDill appealed Adrian's decision to Bond on January 15; in a meeting of January 25 Bond denied the appeal as untimely and agreed with Adrian that it failed to allege a specific violation. McDill then submitted his grievance to the Grievance Committee at Human Resources, but never received any response from the Committee.

While McDill was pursuing his grievance, Bond began asking various permit applicants about possible instances of ethical misconduct on McDill's part. At a Municipal Solid Waste Conference in late January 1993, Bond spoke with Kevin Carel of Laidlaw Corporation about McDill's work on a Laidlaw application. Carel, who lived in Fort Worth, recalled a telephone conversation in which McDill asked where he might find tickets to the Dallas Cowboy playoff game. Carel had also heard rumors that McDill had asked Frank Knickerbocker, a Laidlaw em-

ployee, to pay the college tuition for McDill's daughter. Carel stated that he had no personal knowledge of the incident, and that Knickerbocker had left the company two years before.

During this same time, Adrian recalled a December 1992 conversation with Robert Schultz concerning McDill. While they were both working at the Department of Health, Schultz overheard McDill asking someone on the phone to send $15,000 for reducing the number of groundwater wells required. Adrian reported this to Bond, and they both assumed McDill had been soliciting some kind of bribe from a permit applicant.

In early February Bond approached James Haley, a senior manager, with the idea of terminating McDill for poor job performance; Haley concluded there was inadequate documentation to justify termination on that basis. Bond, Adrian and Haley met three more times in February to discuss the allegations of ethical misconduct against McDill. Haley stated that the allegations could support McDill's termination only if they could be confirmed by individuals with personal knowledge of them. Bond did not further investigate the Laidlaw allegations.

McDill's second report of perceived wrongdoing came in February. That month, McDill and co-worker Andy Pi noticed a forged engineer's seal affixed to a permit application report. McDill was aware that the Engineering Practices Act required engineers to report improperly sealed documents to the Texas State Board of Registration for Professional Engineers ("the Board"). McDill reported the forged seal to Adrian, who said she would discuss it with Bond. At a February 23 staff meeting, Bond and Adrian instructed McDill to send the application back to the company for correction. McDill claims he pointed out that failing to report the forged seal amounted to a violation of state law, but the instructions remained unchanged. After the meeting McDill and Pi reported the matter to the Board; in the

---

3. Although not specifically referenced in the grievance, the TWC written promotion procedures state that employees "who meet all requirements for the higher position" are eligible for that position; it also adopts as promotion guidelines the qualification requirements contained in the job description.

next couple of days Board officials met with McDill and Pi at the TWC.[4] According to Haley, Bond and Adrian learned about McDill's report to the Board by March 1.

On March 1, 1993, Bond and Haley met with McDill to tell him he was being recommended for termination. At this meeting Haley gave McDill a memo indicating five reasons for termination: (1) the Brenham complaint; (2) the Dunham complaint; (3) the communication with Laidlaw regarding football tickets; (4) the request to Laidlaw regarding his daughter's tuition; and (5) the overheard phone conversation concerning the $15,000 for reduction of groundwater monitoring wells. The memo omitted the names of the individuals with personal knowledge of the allegations. In a March 5 letter McDill asked for the names of his accusers and requested a pre-termination meeting, stating that the information behind the allegations had been gathered by the individual subjects of his grievances. He requested an independent investigation of the charges against him.

Haley and Bond held a pre-termination meeting with McDill and his attorney on March 12. At the meeting McDill reiterated the requests in his letter, to no avail. Three days later, Haley sent a letter to McDill sustaining the decision to fire him. The letter indicated that the football ticket allegation was the one that most concerned Haley, and that he did not rely on the Brenham allegation in making his decision. After receiving the letter on March 24, McDill sought review of the termination decision before a neutral grievance panel.

According to TWC termination procedure rules, an employee can obtain a grievance hearing on a termination by filing an appeal within ten working days of receiving the termination letter. Alternatively, TWC grievance rules, cross-referenced in the termination procedure rules, provide that an employee can obtain a hearing by discussing it informally with the employee's immediate supervisor within ten days of the action giving rise to the grievance. If the supervisor fails to discuss the grievance within five additional working days, the employee must then submit the grievance in writing.

On April 7, ten working days after receiving the termination letter, McDill left three messages on Adrian's voice mail indicating a desire to discuss the termination. Five working days later, McDill sent a written grievance to Adrian. Although McDill apparently complied with the TWC grievance procedures as written, Haley denied his appeal as untimely because the original appeal to Adrian was not in writing. Haley admitted in his testimony that the termination procedures did not explicitly require the initial appeal to be in writing. Nevertheless, Haley contended that the rule requiring the initial appeal to be "filed" indicated that the appeal *must* be in writing, despite the fact that the termination procedures cross-referenced the grievance rules called for an informal initial appeal. McDill never obtained a hearing before a neutral grievance panel.

After unsuccessfully pursuing other avenues to obtain the names of his accusers, McDill filed suit against TNRCC. Material obtained through discovery provided McDill with the names of the individuals whose information led to the allegations of ethical misconduct. At trial, McDill convincingly disputed each of the ethical misconduct allegations.

### Discussion and Holdings

■ TNRCC complains in its first point of error that the jury charge did not sufficiently set forth the causation element necessary to establish liability under the Whistleblower Act. The Act provides that a governmental entity may not terminate an employee who reports violations of law committed by the entity or another public employee. Tex.Gov't Code Ann. § 554.002 (West Supp.1996). The Act does not describe the causal link which must be proven between the report and the termination. *See Department of Human Servs. v. Hinds,* 904 S.W.2d 629, 631 (Tex. 1995).

---

4. In a May 1993 letter, the Board determined that the applicant had violated the Act, but that there was insufficient evidence to conclusively prove Adrian and Bond had done so.

The court submitted the following question to the jury:

Did the Texas Water Commission terminate or otherwise discriminate against Tom McDill for reporting in good faith one or more suspected violations of law to appropriate law enforcement authorities?

The instructions following the question did not address the issue of causation. Thus to find TNRCC liable, the jury was required only to find the broad causal link that McDill was terminated "for reporting" violations of the law. TNRCC submitted the following instruction which would have narrowed the causative element:

You are instructed that if Defendant would have taken the same action with respect to Plaintiff without consideration of Plaintiff's "whistleblowing" activity, if any such activity occurred, Defendant may not be held liable for any violation of the Texas Whistleblower Act, including the retaliation referred to in these questions.

The trial court refused the instruction.

The supreme court has recently defined the proper causation standard for establishing liability in whistleblower cases. *See Hinds,* 904 S.W.2d at 631 (decided after the trial of this case). *Hinds* inquired as to what role the report of illegal conduct should play in the decision to terminate—whether it must be the "sole reason" to terminate, a "principal reason," a lesser but necessary factor, or one of several factors each of which could form the basis of the decision. *Id.* at 632. The court initially rejected the "sole reason" standard, concluding that the legislature would have specified that standard if it had intended to so limit causes of action under the Act. *Id.* at 634.

*Hinds* set forth three reasons why a "principal reason" causation standard should not be adopted in whistleblower cases: (1) the obvious difficulty in determining what makes a reason "principal"; (2) the Act does not seem to permit the employee's report of illegal activity to provide any basis, however small, for the termination decision; and (3) this standard would not adequately protect employers who harbored bad motives against an employee for making a report, but did not act on those motives in sanctioning the em-

ployee. *Id.* at 635. Perhaps the most serious deficiency of the "principal reason" standard identified in *Hinds* was that it could shield from termination an employee who reports misconduct, even when other circumstances warrant termination. An employee who reports misconduct could never be terminated even for valid reasons because the report would inevitably play some part in any decision the supervisors made about that employee. *Id.* at 636.

Having identified so many weaknesses with the "principal reason" standard of causation, the court formulated an alternative causation standard: "the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Id.* Thus the court established a "but for" causal nexus requirement between the report of misconduct and the employer's actions.

The *Hinds* jury was asked whether the Department of Human Services discriminated against Hinds "in retaliation for his report" of alleged wrongdoing; the charge provided no additional instruction on causation. *Id.* at 637. The court held that the absence of such an instruction was error. In considering the issue, the court noted that Hinds was not entitled to the statutory presumption that his report caused the termination. *See* Tex.Gov't Code Ann. § 554.004 (West 1996).

■ The standard of causation employed in McDill's jury charge mirrors that rejected by the court in *Hinds.* Unlike Hinds, however, McDill was entitled to the presumption that his termination was an act of retaliation for his reports of wrongdoing. *See* Tex.Gov't Code Ann. § 554.004 (West 1996) (suspension or termination of employee within ninety days of employee's report of illegal conduct is presumed to be in retaliation for report). McDill claims that this distinction removes the need for the *Hinds* causation instruction. We disagree. The rebuttable presumption afforded by section 554.004 does not shift the burden of proof, and can stand only in the absence of evidence to the contrary. *Garza v. City of Mission,* 684 S.W.2d 148, 151–52 (Tex.App.—Corpus Christi 1984, writ

dism'd). Once sufficient evidence is produced to support a finding of the non-existence of the presumed fact, the case then proceeds as if no presumption ever existed. *Id.* at 152. Evidence at trial suggesting no connection between McDill's report and his discharge rebutted the presumption, thus McDill was required to prove a causal connection between the report and the termination. The failure of the charge to employ the proper standard of causation was therefore error. *See* Tex.R.Civ.P. 277; *Hinds,* 904 S.W.2d at 637.

■ For TNRCC to complain of this error on appeal, it was required to submit a substantially correct instruction to the trial court. *See* Tex.R.Civ.P. 278; *Hinds,* 904 S.W.2d at 637. We believe TNRCC's instruction provides a standard sufficiently similar to the one later approved in *Hinds* to preserve error. TNRCC derived its instruction from *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which the supreme court relied on heavily in formulating the *Hinds* standard. *See Hinds,* 904 S.W.2d at 636. Although TNRCC's instruction lacks a timing element, it does set forth the "but for" aspect of causation that is central to the *Hinds* instruction. The proposed instruction therefore called the trial court's attention to the causation element missing in the jury charge. *See State Dep't of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex.1992) (to preserve jury charge error, party must timely and plainly make trial court aware of complaint and obtain a ruling).

■ McDill argues that TNRCC nevertheless failed to preserve error because its proposed instruction was buried in a multitude of requests for other questions and instructions. *See* Tex.R.Civ.P. 274 (request obscured by voluminous unnecessary requests or objections will not preserve error). TNRCC requested eleven separate instructions, most of which were only one sentence long. We do not believe this number of requests prevented the trial court from reviewing the substance of each individual proposed instruction. McDill further complains that TNRCC did not give any special empha-

sis to the instruction at issue, but this is not required to preserve error. *See* Tex.R.Civ.P. 278. We hold that TNRCC's proposed instruction preserved error on the issue of causation.

■ The trial court's error requires reversal of the judgment only if it "was reasonably calculated to cause and probably did cause the rendition of an improper judgment." Tex.R.App.P. 81(b). We first consider what TNRCC's proposed instruction would have added to the jury charge. This Court had previously determined that this instruction would have added nothing to the jury question. *See Department of Human Servs. v. Green,* 855 S.W.2d 136, 150 (Tex.App.—Austin 1993, writ denied). The *Hinds* court disagreed, but acknowledged that failure to include the instruction may not have been reversible error "in the circumstances" of the *Green* case. *Hinds,* 904 S.W.2d at 634–35. Regrettably, the supreme court did not indicate what those extenuating circumstances were. We will therefore proceed to analyze the effect of omitting the instruction as it relates to the holding and reasoning in *Hinds.*

*Hinds* established that TNRCC's proposed instruction would have informed the jury that "if the employer had sufficient legitimate grounds for taking action against the employee, it could not be liable for the action simply because an additional ground was the employee's report of illegal conduct." *Hinds,* 904 S.W.2d at 634–35. The jury found that McDill's supervisors considered his report of misconduct in deciding to fire him. The instruction would have required the jury to make an additional determination as to whether consideration of McDill's report was *necessary* to the decision to terminate.

Had the jury determined that TNRCC's allegations of ethical misconduct served as sufficient, legitimate reasons to terminate McDill, it could not have found TNRCC liable just because McDill's reports of allegedly illegal conduct were also considered in the decision-making process. *See Hinds,* 904 S.W.2d at 636. The parties vigorously disputed the motivations and factual support behind the ethical misconduct allegations. But neither the evidence nor the charge sug-

gests that the jury made a determination as to the validity of these misconduct allegations in reaching the verdict that it did. Thus the jury could have concluded that the ethical misconduct allegations provided sufficient grounds for his termination, but still found TNRCC liable for considering the additional (and superfluous) factor of McDill's report of wrongdoing. *Hinds* cannot tolerate this possibility. Accordingly we hold that the "absence of a proper causation instruction, in these circumstances, was reasonably calculated to prevent the jury from making the finding necessary to establish liability under the statute, thereby resulting in an improper judgment." *Hinds,* 904 S.W.2d at 637. We sustain TNRCC's first point of error.

McDill brings two cross-points of error, and asks this Court to rule on them in the event that the judgment of the cause is reversed. Similarly, TNRCC asks us to hold that McDill as a matter of law cannot seek exemplary damages in any future trial. Because our Constitution forbids this Court from issuing advisory opinions, we do not reach these or any other remaining issues. *See* Tex. Const. art. V, § 8; *Camarena v. Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988); *Texas Parks & Wildlife Dep't v. Texas Ass'n of Bass Clubs,* 622 S.W.2d 594, 596 (Tex.App.—Austin 1981, writ ref'd n.r.e.).

Because we sustain TNRCC's first point of error, we reverse the trial court judgment and remand the cause for a new trial.