**Franklin GOLD, Appellant,**

v.

**CITY OF COLLEGE STATION, City of Bryan, and Brazos Valley Solid Waste Management Agency, Appellees.**

No. 01–98–01056–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 8, 2001.

Michael M. Essmyer, Houston, for Appellant.

Bettye S. Springer, Juilie Benson Ross, Fort Worth, for Appellees.

Panel consists of Justices MIRABAL, HEDGES, and SMITH.*

## OPINION

MIRABAL, Justice.

Appellant, Franklin Gold, (Gold) challenges a summary judgment rendered in favor of appellees, City of College Station, City of Bryan, and Brazos Valley Solid Waste Management Agency (BVSWMA) against his claim of wrongful discharge based on the Texas Whistleblower Act.[1] We reverse.

## FACTUAL BACKGROUND

Gold worked at the Rock Prairie Landfill (the landfill) in College Station as an operations supervisor from July 18, 1983, until his termination on October 2, 1995. The landfill was operated and managed by Gold's employer, BVSWMA, for the joint benefit of College Station and Bryan.

The landfill is subject to numerous federal and state regulations regarding solid waste disposal at the site. For example, these regulations (1) require that solid waste be encapsulated within barrier walls to prevent ground and surface water contamination; (2) prohibit the placement of solid waste on top of or outside the barrier walls; and (3) prohibit the discharge of solid waste or pollutants into adjacent waterways. As a certified solid waste technician, Gold was knowledgeable about these regulations. Part of Gold's job responsibilities, as operations supervisor, included determining where trucks unloaded solid waste at the landfill.

The on-site landfill manager, and Gold's supervisor from May 1993 until Gold's termination, was Anthony Schleisman (Schleisman). Gold reported directly to Schleisman, and Schleisman reported directly to Bill Angelo (Angelo), executive director of BVSWMA since April 1994. Gold and Schleisman were the top two managerial employees of BVSWMA at the

---

* The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. *See* TEX.GOV'T CODE ANN. §§ 554.001–.009. (Vernon Supp.2001)

landfill. Angelo occasionally visited the landfill, but was not there on a daily basis.

During their tenure together at the landfill, Gold and Schleisman had an acrimonious working relationship. Angelo counseled both men about this issue and warned them that if they did not learn to get along and operate the landfill together, he would fire them both.

On September 6, 1995, Schleisman gave Gold a written reprimand and placed him on six-months probation for spilling leachate.[2] After receiving the reprimand, Gold scheduled a meeting with Angelo on September 11, 1995. At the meeting, Gold told Angelo that he thought the reprimand was unfair because Schleisman knew that leachate had been spilled in the past and had tacitly encouraged the spills by ordering the crew to move the leachate "no matter what it took."

On September 12–13, 1995, Schleisman joined Angelo and Gold in the meeting. At some point during the three-day meeting, Gold told Angelo that other rules had been violated at the landfill that constituted more egregious violations than spilling leachate. Angelo asked, "What rules?" Gold responded that solid waste had been unloaded on top of and outside the barrier walls, and that contaminated water from the landfill had been allowed to run into a nearby creek. Although Gold alleged that Schleisman knew of these violations, Schleisman denied that he had any knowledge.

Angelo ordered an excavation of the area along the barrier wall where Gold reported that the solid waste had been improperly buried. The excavation revealed solid waste on top of and outside the barrier wall, as well as leachate and waste contaminated soil.

Angelo placed Gold and Schleisman on administrative leave with pay. After further investigation, Angelo offered Schleisman the choice of resignation or termination. Schleisman resigned. Gold was not offered the opportunity to resign and was terminated by Angelo on October 2, 1995, following a pre-termination hearing. After his termination, a review board determined that Gold was justly terminated.

## PROCEDURAL HISTORY

◼ Gold sued appellees, City of College Station, City of Bryan, and BVSWMA (government entities) alleging retaliation in violation of the Texas Whistleblower Act. *See* TEX.GOV'T CODE ANN. § 554.002 (Vernon Supp.2001). The government entities moved for summary judgment on three grounds: (1) Gold's report of his own illegal activity is not protected by the Act; (2) the government entities articulated a legitimate, non-retaliatory reason for terminating Gold—his own illegal conduct; and (3) Gold cannot produce competent summary judgment evidence to show that he was discharged because he reported a violation, i.e., no causal link between the report and Gold's discharge.[3]

The trial court granted the government entities' motion for summary judgment, but did not state the grounds for the decision in the order. Gold appeals the judgment in a single issue, complaining that

---

2. Leachate is a liquid, usually stormwater, that has passed through solid waste and contains contaminants from the waste.

3. The government entities did not assert as grounds for summary judgment that Gold failed in some other way to properly report the alleged violations. Our review is limited to the grounds asserted. *See Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993) (holding summary judgment cannot be affirmed on grounds not expressly set out in motion or response).

the trial court erred in granting summary judgment.

## STANDARD OF REVIEW

■ The purpose of the summary judgment rule is not to provide for a trial by deposition or affidavit. *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 563 (1962). Rather, the summary judgment rule provides a method for summarily ending a case that involves only a question of law and no fact issues. *Cigna Ins. Co. v. Rubalcada,* 960 S.W.2d 408, 411 (Tex.App.—Houston [1st Dist.] 1998, no pet.). Our duty is to determine if there are any material fact issues to try, not to weigh the evidence or determine its credibility and try the case on the affidavits and depositions presented. *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 931 (1952). In this case, the government entities sought both a no-evidence and traditional summary judgment.

### A. No–Evidence Summary Judgment

■ In a no-evidence summary judgment, the movant must specifically state the elements as to which there is no evidence. Tex.R.Civ.P. 166a(i). The burden then shifts to the nonmovant to produce evidence that raises a fact issue on the challenged elements. *Id.* When reviewing the grant of a no-evidence summary judgment, we assume all evidence favorable to the nonmovant is true, and indulge every reasonable inference and resolve all doubts in favor of the nonmovant. *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.,* 994 S.W.2d 830, 834 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (rule 166a(i) motion). A no-evidence summary judgment is improperly granted if the nonmovant brings forth more than a scintilla of evidence to raise a genuine issue of material fact. Tex.R.Civ.P. 166a(i).

### B. Traditional Summary Judgment

■ A traditional summary judgment brought pursuant to Texas Rule of Civil Procedure 166a(c) is proper only when the movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R.Civ.P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). In reviewing a summary judgment, we must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in his favor. *Johnson,* 891 S.W.2d at 644; *Lawson v. B Four Corp.,* 888 S.W.2d 31, 33 (Tex. App.—Houston [1st Dist] 1994, writ denied). We will take all evidence favorable to the nonmovant as true. *Id.* As movant, the defendant is entitled to summary judgment if the evidence disproves, as a matter of law, at least one element of each of the plaintiff's causes of action or conclusively establishes each element of an affirmative defense. *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (Tex. 1996).

■ When a trial court does not state the basis for its decision in its summary judgment order, as in this case, we must uphold the order if any of the theories advanced in the motion are meritorious. *Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 79 (Tex.1989).

## THE WHISTLEBLOWER ACT

### B. Violation by Governmental Entity or Another Public Employee

■ The Texas Whistleblower Act prohibits a governmental employer from terminating an employee who in good faith reports a violation of the law by the employing governmental entity or another public employee to an appropriate law enforcement authority. Tex.Gov't Code Ann.

§ 554.002(a). In moving for summary judgment, the government entities argued that the Whistleblower Act does not afford Gold protection because he reported his *own* illegal conduct, rather than reporting violations by BVSWMA or another public employee. Gold contends that while he may have reported his own violations, he also reported violations by BVSWMA management, including Schleisman, and violations attributable to BVSWMA as a government entity.

The summary judgment evidence included the affidavit and deposition of Angelo. According to Angelo, Gold reported that he, and employees working under his supervision, committed the violations that included the dumping of solid waste on top of and outside the barrier wall and allowing contaminated water to run into the creek. Other summary judgment evidence in the record, however, indicates that, in addition to implicating himself, Gold also told Angelo about violations committed by Schleisman, BVSWMA management, and other employees.

Gold states in his affidavit that during his meeting with Angelo on September 11, 1995, he "reported the numerous regulatory violations at the [l]andfall which were being allowed to occur by Schleisman and BVSWMA management, including the unloading of solid waste on top of and outside the barrier wall on wet weather days, and contaminated water run-off."

At his deposition, Gold explained the substance of what he had reported to Angelo in the following cross-examination:

[Defense counsel]: What was the reason that you ... went to see Bill Angelo?

[Gold]: We went there to discuss several problems with the landfill.

[Defense counsel]: What were those?

[Gold]: One problem was the spilling of leachate. We also talked about that it was unfair for Tony [Schleisman] to write me up for spilling leachate when Tony knew we were spilling leachate in order to get production.

[Defense counsel]: What else did you discuss in that meeting?

[Gold]: We discussed solid waste being unloaded outside the walls, we discussed contaminated water running away from the sites, solid waste that needed to be covered and not given enough time to do the job correctly. We discussed the walls that had solid waste on them or beyond them that needs cleaning up.

. . . .

[Defense counsel]: Can you tell me the best you recollect what problems you related to Mr. Angelo during that meeting on September the 11th?

[Gold]: I told him that one of the problems that we're having is when it rains real hard, we don't have a good place to put solid waste. We have to unload outside the barrier lines next to the road and push it all uphill, which is against the rules to unload outside the walls.

The second problem is that water would take solid waste, which would be contaminated water, down in the creek, it would run towards Pebble Creek area. I said that's another violation.

And I told him that Tony [Schleisman] would not let me stop ... to redo the walls that were being destroyed in the everyday workload we had. And I told him what the problem was with the walls, we could not clean it up good enough before dark, solid waste would be left on the walls. . . .

Viewing the summary judgment evidence in the light most favorable to Gold, and indulging all reasonable inferences in his favor, we hold that the summary judgment evidence not only constitutes some evidence that Gold reported a violation by BVSWMA or another employee, but raises

a genuine issue of material fact on this element. Therefore, summary judgment cannot be granted on this point.

## B. Causal Link

In support of their summary judgment, the government entities also argued that Gold cannot prove a causal link between his report and his termination. They contend that Gold was discharged because he committed a violation, not because he reported a violation.

 An employee suing under the Whistleblower Act must prove that without the reports of violations of law, the retaliatory conduct would not have occurred when it did. *Texas Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 636 (Tex.1995). In other words, the plaintiff must establish a "but for" causal nexus between the protected activity and the employer's prohibited conduct. *Texas Natural Resource Conservation Comm'n v. McDill,* 914 S.W.2d 718, 723 (Tex.App.—Austin 1996, no writ). The plaintiff need not establish, however, that the protected activity was the sole cause of the employer's prohibited conduct. *Hinds,* 904 S.W.2d at 635.

 We presume the causal nexus exists if the retaliatory conduct occurs within 90 days of the report of a violation of law. Tex.Gov't Code Ann. § 554.004(a). This presumption is rebuttable. *Id.* The rebuttable presumption afforded by section 554.004(a), however, does not shift the burden of proof, and can stand only in the absence of evidence to the contrary. *McDill,* 914 S.W.2d at 723. Once sufficient evidence is produced to support a finding of the non-existence of the presumed fact, the case then proceeds as if no presumption ever existed. *Id.*

 The government entities offered Angelo's affidavit and correspondence sent to Gold from Angelo regarding his termi-

nation to corroborate their argument that Gold was terminated because of his own misconduct, not because he reported violations. The reasons provided by Angelo in his affidavit for Gold's termination were (1) Angelo's complete lack of confidence in Gold's ability to operate the landfill in accordance with state and federal regulations; (2) Gold's failure to contain contaminated storm water runoff and spilling leachate; (3) Gold's failure to provide for adequate wet weather fill operations; and (4) Gold's knowing participation and supervision of operations that were in violation of state and federal regulations. These were also the reasons given for Gold's discharge stated in the termination decision memorandum prepared by Angelo and provided to Gold.

Even though Gold was terminated within 90 days of his reporting, the government entities' summary judgment evidence rebutted the presumption of a causal nexus. Thus, Gold was required to present evidence of a causal connection between the report and his termination. *Id.*

 In analyzing the legal sufficiency of evidence supporting a jury verdict in a whistleblower case, the Texas Supreme Court recently noted in *City of Fort Worth v. Zimlich* that certain types of circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct. 29 S.W.3d 62, 69 (Tex.2000). The *Zimlich* court stated that such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.*

The *Zimlich* court clarified the analysis by stating: "[E]vidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. There must be more." *Id.* We note the inherent difficulty of producing direct evidence of an employer's illegal motivation, especially at a summary judgment proceeding. *Ruiz v. City of San Antonio*, 966 S.W.2d 128, 132 (Tex. App.—Austin 1998, no pet.); *see also Castaneda v. Texas Dep't of Agric.*, 831 S.W.2d 501, 505 (Tex.App.—Corpus Christi 1992, writ denied) (stating issue of causation in whistleblower case not readily controvertible).

Gold submitted summary judgment evidence related to Angelo's negative attitude following his report of the violations. Specifically, Gold offered his affidavit testimony that after he reported the violations during the September 11, 1995 meeting, Angelo became upset and stated: "We are paying you dollars to be imaginative."

The summary judgment evidence also suggests that Gold may have suffered discriminatory treatment in comparison to similarly situated employees. Angelo's deposition testimony reveals that Gold was the only employee terminated following the report, although other landfill employees had knowledge of, and participated in, the violations.

The summary judgment evidence reveals that Angelo offered Schleisman, the on-site landfill manager, the opportunity to resign before he was terminated, despite his responsibility for regulatory compliance at the landfill and reported participation in the violations. The same opportunity was not presented to Gold. Schleisman took that opportunity and resigned before Gold's termination.[4]

The summary judgment evidence also reveals that Howard Stough, an employee of the landfill, who was one step below Gold in the management hierarchy and had "limited supervisory functions," worked full-time at the landfill for over a year before Gold was terminated. Because he worked at the landfill, Angelo admitted that Stough could have also been in a position to view the violations.

The summary judgment evidence also showed that when Gold was absent, Stough acted in his place. The testimony of a former employee of the landfill revealed that waste was also dumped outside the barrier when Gold was not at the landfill. Although Angelo stated that Stough denied any knowledge about dumping waste outside the walls, he admitted that Stough had "some concerns to that regard." Stough had also admitted to Angelo that he was aware that contaminated water had been dumped directly into the creek between 1987 and 1992. Despite this information, Stough was eventually given a raise and promoted to Gold's position after Gold's termination.

In response to the motion for summary judgment, Gold included evidence related to whether the stated reason for his termination was false. It is uncontested that Gold participated in the conduct that he reported, and that he knew that the conduct constituted violations. However, the summary judgment evidence suggests that

---

4. Angelo testified, and the government entities contend, that if Schleisman had not resigned, he would have been terminated at the same time as Gold. Angelo also testified that he did not offer Gold the opportunity to resign because "[Gold] indicated that he would fight to keep his job tooth and nail." However, the fact remains that Schleisman, who was also responsible for the violations, but who did not report the violations, was offered the option to resign in lieu of termination, whereas Gold was not.

the violations may not only have been known to BVSWMA's management, but also tacitly and expressly endorsed by it until Gold requested a meeting with Angelo. Gold contends that this shows that he was not terminated when he followed orders and committed violations, but only when he reported the violations. He argues that this demonstrates that he was not terminated for committing the violations, but for reporting the violations.[5]

Gold's affidavit and deposition testimony state that he had reported compliance problems at the landfill to his supervisors since the beginning of his employment. Specifically, he had informed his supervisors that the trucks could not reach the authorized areas for dumping during wet weather and, as a result, had to dump the waste outside the barrier walls.

Gold's summary judgment evidence also included the corroborative deposition testimony of a former landfill employee, David Fisk, who testified that he complained to Schleisman about the regulatory violations, and also heard Gold complain to Schleisman about the violations. Fisk and Gold each testified that Schleisman directed the landfill employees to pump contaminated water into the creek. Gold testified that Schleisman instructed him to dump waste outside the barrier walls and to "just get the trucks in and out."

Gold also introduced summary judgment evidence that Angelo was aware of the violations before the September 11, 1995 meeting, including his affidavit testimony that he told Angelo about dumping waste outside the barrier wall when Angelo visited the landfill in the spring of 1995.[6] Fisk also recalled that Gold had testified at a board meeting in 1994, at which Angelo was present, that the landfill was not in compliance. Fisk specifically recalled Gold telling the board that contaminated water had been pumped into the creek near the landfill.

The record also contains a memorandum from Angelo to Gold dated September 8, 1994. The stated subject of the memorandum was "performance concerns." In sum, the memorandum chastised Gold for failing to keep an earlier promise that he had made to Angelo that he would (1) work with his supervisor not against him, (2) promote harmony amongst the work force, (3) conduct himself in a professional manner at all times, (4) follow the chain of command, and (5) respect the position of his supervisor.

In the memorandum, Angelo cited the following as an example of Gold's failure to keep these promises:

Recently, you made statements which lead one to believe that the landfill was out of compliance with state regulations due to the decisions made by the landfill manager. In fact, you made it seem

---

**5.** The government entities denied any prior knowledge of the violations.

**6.** In their reply to Gold's response, the government entities asserted that Gold's affidavit testimony that Angelo was aware of the violations directly contradicts his earlier deposition testimony. We acknowledge that a party cannot file an affidavit to contradict his own deposition testimony without any explanation for the change in the testimony for the purpose of creating a fact issue to avoid summary judgment. *Farroux v. Denny's Restaurants,* *Inc.* 962 S.W.2d 108, 111 (Tex.App.—Houston [1st Dist.] 1997, no writ). However, Gold's deposition testimony on this issue is confusing. Gold testified that he told Angelo that the landfill was not in compliance approximately five to eight months before he was terminated in October 1995. But Gold also testified that he had not told Angelo about the specific compliance problems at the landfill. Based on the state of the record, it is not clear that Gold's affidavit conflicts with his earlier deposition testimony on this issue.

that the manager had actually ordered you to take action that was in violation of state regulations. The truth of the matter is that the landfill received several letters of noncompliance from the state prior to Mr. Schleisman's employment but have received only general compliance letters since he became landfill manager.

Angelo testified that the statements referenced in the memorandum were made by Gold at a board hearing. He admitted that he never asked Gold how the landfill was out of compliance after hearing Gold's statement.[7]

Indulging all reasonable inferences in favor of Gold, we hold that the summary judgment evidence constituted some evidence as to the existence of a causal link between Gold's report and the government entities' alleged retaliatory conduct, and raised a genuine issue of material fact on this element. Summary judgment cannot be granted on this point.

## C. Public Policy

■ The government entities also contend that it is against public policy to allow a public employee, such as Gold, who engages in the violation reported, to benefit from the protection of the Whistleblower Act. They argue that, even if Gold reported illegal conduct by others, the fact that he also reported his own illegal conduct takes him outside the Whistleblower Act. The government entities assert that the legislative intent of amending section 524.002 of the Whistleblower Act in 1995 was to close a loophole in the act that allowed a government employee to receive

protection for reporting his own illegal conduct. ·

The pre–1995 version of section 524.002(a) provided that: "A state agency or local government may not suspend or terminate the employment of or discriminate against a public employee who in good faith reports a violation of law to an appropriate law enforcement authority." Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws. 583, 610. In 1995, the legislature added qualifying language to this section which limited the protection of the act to those employees who "in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." *See* TEX. GOV'T CODE ANN. § 554.002(a).

The government entities contend that the legislature's intent to disallow protection under the Whistleblower Act for employees reporting their own violations is apparent from the plain language of the 1995 amendment to section 524.002 and comports with public policy to not reward wrongdoers.

■ In interpreting the practical effects of a statutory amendment, appellate courts must look for and give effect to the intent of the legislature. *See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex.1998); *see also City of San Antonio v. Marin*, 19 S.W.3d 438, 440 (Tex.App.—San Antonio 2000, no pet.) (interpreting 1995 change to Whistleblower Act relating to exhaustion of grievance procedure before filing suit). And in determining legislative intent, appellate courts must examine the statute as a whole, not merely isolated provisions of

7. In his deposition, Angelo explained that the paragraph quoted above needs to be read in the context of the entire memorandum. He stated that he also instructed Gold in the memorandum to file a grievance if he had any complaints regarding the landfill's operation. However, the relevance and purpose of the paragraph are not readily determinable from the face of the memorandum and are properly left to the fact finder.

the statute. *See Chevron Corp. v. Redmon,* 745 S.W.2d 314, 316 (Tex.1987). Moreover, the fact that the legislature enacts an amendment indicates that it thereby intended to change the original act by creating a new right or withdrawing an old one. *Durish v. Channelview Bank,* 809 S.W.2d 273, 277 (Tex.App.—Austin 1991, writ denied).

Applying these rules and reviewing the plain language of the statute, the 1995 changes to section 554.002(a) make clear that the act does not provide protection to a public employee who reports *only* his own illegal conduct. However, as already noted, the summary judgment evidence raises a fact issue about whether Gold is reporting solely his own violations or also reporting those of his employing government entity and his supervisor, Schleisman. The main issue presented is whether the act, as amended, disallows protection for a public employee who reports both his illegal conduct *and* that of others.[8]

■ Texas courts have held that the Whistleblower Act has a remedial purpose in that it is designed to enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing. *See Upton County v. Brown,* 960 S.W.2d 808, 817 (Tex.App.—El Paso 1997, no writ); *Stinnett v. Williamson County Sheriff's Dept.,* 858 S.W.2d 573, 575 (Tex. App.—Austin 1993, writ denied); *Castaneda v. Texas Dep't of Agric.,* 831 S.W.2d 501, 503 (Tex.App.—Corpus Christi 1992, writ denied); *see also, Davis v. Ector County,* 40 F.3d 777, 785 (5th Cir.1994)

(noting Texas Whistleblower Act designed to enhance openness in government and compel government's compliance with law by protecting those who inform authorities of wrongdoing). We agree with the government entities that the act does not give a public employee life tenure. *See Hinds,* 904 S.W.2d at 633 (expressly rejecting proposition that Whistleblower Act gives employee life tenure). However, we do not agree that a public employee who participates in the reported conduct can never satisfy the requirements of the Whistleblower Act. *Cf. City of Brenham v. Honerkamp,* 950 S.W.2d 760, 767 (Tex.App.—Austin 1997, pet. denied) (holding that Whistleblower Act does not require employee to prove that he was free from involvement in reported violation to show he made "good faith report" under act). We hold that if the public employee establishes the requisite elements required for a whistleblower claim (i.e., termination caused by good faith reporting of a violation of law by a government entity or another public employee to an appropriate law enforcement authority), then the public employee can still benefit from the act's protection even if he participated in the reported conduct. *See* Tex.Gov't Code Ann. § 554.002.

We sustain Gold's sole issue.

### CONCLUSION

We reverse the judgment and remand the cause to the trial court.

---

8. We note that the law review article referenced by the government entities' counsel at argument, *The Texas Whistleblower Act: Time For A Change,* 26 Tex. Tech. L.Rev. 75 (1995), does not resolve this issue. The article discusses how, in the author's opinion, Texas courts have gone too far in expanding the act beyond its original purpose. However, the article does not discuss the 1995 amendment at issue in this case or the issue of whether a public employee who reports his own illegal conduct is entitled to protection under the act.