United States Court of Appeals
Fifth Circuit

**F I L E D**

July 15, 2003

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**No. 01-20366**

---

**MARILYN MURR DOYLE, MD**

**Plaintiff-Appellant,**

**versus**

**HARRIS COUNTY,**

**Defendant-Appellee.**

---

**Appeal from the United States District Court
for the Southern District of Texas
(H-98-CV-2201)**

---

Before SMITH and BARKSDALE, Circuit Judges, and DUPLANTIER, District Judge[*].

PER CURIAM:[**]

This appeal is from a post-trial judgment as a matter of law, vacating Dr. Marilyn Murr Doyle's jury award on her claims under 42 U.S.C. § 1983 (free speech) and the Texas Whistleblower Act, TEX. GOV'T CODE §§ 554.001-.009. At issue is whether a reasonable jury could have concluded that Dr. Doyle's termination from her

---

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

[**]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

governmental position was caused by her comments to a newspaper, among others.  **AFFIRMED**.

I.

Dr. Doyle was an assistant medical examiner, as well as one of three doctors considered senior pathologists, for the Harris County Medical Examiner's Office (HCMEO).  She began with the HCMEO in 1992.

In 1996, Dr. Joye Carter was employed as HCMEO Chief Medical Examiner to implement a number of policy changes for the Harris County Commissioners Court.  These changes included phasing out doctors' full-time use of county cars, forbidding doctors from performing outside autopsies on county time, and creating stricter attendance and time-scheduling requirements.  These changes were not welcomed by HCMEO doctors and staff.

In September 1997, Dr. Carter employed Dr. Delbert Van Dusen as a pathologist; Dr. Van Dusen did not have a Texas medical license, although he was licensed elsewhere and was studying for his Texas license.  The HCMEO staff discovered Dr. Van Dusen did not have a license because senior pathologists were asked to sign death certificates for autopsy work he performed.

Dr. Doyle had disciplinary problems under Dr. Carter.  In January 1997, approximately a year before the key dates for this action, Dr. Carter verbally consulted Dr. Doyle concerning a number of unplanned absences.  Some of these were due to Dr. Doyle's son's

2

illness; nevertheless, unexplained absenteeism continued, as covered by a memorandum from Dr. Carter to Dr. Doyle on 15 May 1997.

Dr. Doyle also had a number of verbal confrontations with supervisors and colleagues.  On 6 November 1997, Dr. Doyle called the Deputy Chief Medical Examiner, Dr. Tommy Brown, her direct supervisor, a liar because she did not believe his response to a question regarding distribution of undesirable autopsy cases.  As a result of this confrontation, Dr. Brown recommended Dr. Doyle's termination.  Dr. Carter did not then terminate Dr. Doyle.

Rudy Flores, court coordinator, also reported an incident with Dr. Doyle on 8 December — Dr. Doyle would not testify at court on short notice, although the scheduled doctor was sick.  Dr. Doyle was verbally counseled by Drs. Carter and Brown, and Alex Conforti, HCMEO chief administrative officer, on 18 December, regarding the Flores incident, properly using the security card system, and other issues.

Around this time, Dr. Doyle attended a medical conference in Atlanta where she learned Dr. Van Dusen had failed his pathologist fellowship program; this caused her concern because she was signing death certificates for Dr. Van Dusen.  Dr. Doyle shared this information with other HCMEO doctors.

On 5 January 1998, Drs. Carter and Brown met with Dr. Doyle and instructed her to stop gossiping about Dr. Van Dusen's

credentials. Dr. Doyle complained about having to sign Dr. Van Dusen's death certificates and, according to her testimony, informed Dr. Carter that she believed Dr. Van Dusen's performance of autopsies was an illegal practice of medicine. Dr. Doyle and Dr. Patricia Moore, an associate medical examiner, testified that Dr. Carter's attitude toward Dr. Doyle changed after 5 January.

On 7 January, Dr. Doyle refused to sign one of Dr. Van Dusen's death certificates and autopsy reports. Two days later (9 January), Dr. Doyle met with District Attorney Holmes to express her concerns regarding Dr. Van Dusen. The District Attorney stated he would maintain Dr. Doyle's anonymity, unless it was necessary to reveal her name in the course of prosecution. The District Attorney informed Dr. Doyle that he thought Dr. Van Dusen might be illegally practicing medicine and assigned Don Stricklin, the District Attorney's first assistant, to investigate.

Stricklin later contacted Rose Garcia, an attorney for HCMEO on non-criminal matters, to discuss the matter. Stricklin testified that, in the first meeting, he never mentioned Dr. Doyle's name. He was not certain when her name first came up; but, at some point, he did mention Dr. Doyle by name. Garcia met with Dr. Carter at least once a week.

Around that time, Dr. Parungao, another senior pathologist, also met with various judges and prosecutors regarding his similar concerns about Dr. Van Dusen. He told Dr. Brown, however, about

4

those conversations with prosecutors. Dr. Brown informed Dr. Carter of his conversation with Dr. Parungao; Dr. Carter replied that she did not believe Dr. Van Dusen's performing autopsies was a problem because he was supervised.

On 9 January (the day of Dr. Doyle's first communication with the District Attorney), Dr. Doyle was provided a follow-up memorandum concerning her 5 January meeting with Drs. Carter and Brown. In it, Dr. Carter stated: "Before you criticize our junior staff, remember the phrase 'people in glass houses'". Dr. Carter then listed a number of Dr. Doyle's past problems, including missing photos from an autopsy report, the exhumation of a body after Dr. Doyle's autopsy left certain questions unanswered, attendance problems, and verbal altercations. Dr. Doyle interpreted the "glass houses" comment as retaliatory and a reference to her meeting with the District Attorney.

The *Houston Chronicle* ran the first of a series of newspaper articles on 16 January concerning the investigation of Dr. Van Dusen. Two days earlier, Dr. Doyle had granted an interview to a *Houston Chronicle* reporter, after he agreed not to publish her name. The article quoted her, without attribution, as stating she was concerned about signing Dr. Van Dusen's death certificates. The article, however, attributed Dr. Doyle's quotes to *two* pathologists.

5

Although the *Houston Chronicle* was delivered daily to Dr. Carter's office for the staff to read, Dr. Carter testified she never read it. Dr. Brown testified he believed Dr. Parungao had spoken to the District Attorney and that conversation had caused the investigation.

On 12 February, Dr. Doyle again met with the District Attorney and other county prosecutors.

On 26 February, Dr. Doyle had another verbal confrontation with Dr. Brown; she told Dr. Brown she would "write him up". Another HCMEO employee witnessed the confrontation.

During this period, because of concerns with using a new security card system and attendance, Dr. Carter conducted a number of time sheet analyses. On 3 March, Dr. Doyle received a memorandum from Conforti indicating she had not followed the security/time sheet policies.

On 16 or 17 March, Dr. Carter learned of three more incidents involving Dr. Doyle. Although the facts are contested, a pathologist assistant reported to Dr. Carter that Dr. Doyle called the assistant a "tonto" and a "maid". Further, Dr. Carter learned from the Chief Toxicologist that Dr. Doyle continued to disregard standard operating procedures for testing. Finally, on 17 March, Dr. Carter reviewed an autopsy report for the Smither case, prepared earlier by Dr. Doyle. While performing that autopsy, Dr. Doyle had not followed Dr. Carter's instructions on which

procedures to conduct.  Further, the report had not been corrected, contrary to Dr. Carter's instructions more than eight months before.  The report did not properly identify trace hair evidence, which had confused the homicide investigation.

On 18 March, with Dr. Brown present, Dr. Carter told Dr. Doyle she could choose to either resign or be terminated and gave Dr. Doyle a memorandum listing reasons for her discharge.  These included problems with the Smither autopsy, verbal altercations with Dr. Brown and others, disregard for toxicology procedures, insults to the pathology assistants, and failure to properly fill out time-sheets and use the security card system.  Also listed was: "Your activities outside the autopsy suite continue to serve only to divide the office".

Two days after Dr. Doyle was terminated, a newspaper article revealed she was the whistleblower.  The next month (April 1998), Dr. Carter was contacted by a representative from the Texas Workforce Commission, concerning a claim filed by Dr. Doyle. According to the report of that communication, Dr. Carter said:

> When all of these things [problems with autopsy, failure to follow toxicology procedures, insults to pathologist assistants] were brought to me from the prior week and weekend[,] on Tuesday I released the claimant [Dr. Doyle].  I knew whatever we did[,] it would hang over us like a whistleblower, but the letter to her predates any media action as do a lot of the general counselings to improve.

Dr. Doyle brought this action against Harris County in mid-1998. After a 14-day jury trial, in March and April 2000, the County was found liable for violating Dr. Doyle's First Amendment right to free speech and the Texas Whistleblower Act. Post-trial, however, the district court granted the County's motion for judgment as a matter of law, holding the evidence insufficient for a reasonable juror to find causation.

## II.

A judgment as a mater of law (JMOL) is reviewed *de novo*. *E.g.,* ***Travis v. Bd. of Regents of Univ. of Texas Sys.***, 122 F.3d 259, 263 (5th Cir. 1997), *cert. denied*, 522 U.S. 1148 (1998). If, after reviewing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in the non-movant's favor, the evidence is insufficient for a *reasonable* jury to find for the non-movant, we will affirm the JMOL. *E.g.,* ***Serna v. City of San Antonio***, 244 F.3d 479, 481 (5th Cir.), *cert. denied*, 534 U.S. 951 (2001). In evaluating the evidence, we must review the record as a whole. ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 150 (2000). The court should give credence to all evidence favoring the non-movant and all uncontradicted and unimpeached evidence supporting the moving party, at least to the extent it comes from disinterested witnesses. *Id.* at 151.

Because the standards for recovery for the free speech and Whistleblower claims are similar, we will address them together.

8

To recover under a First Amendment retaliation claim, brought through § 1983, a party must: (1) suffer an adverse employment action; (2) show that the speech in question was a matter of public concern; (3) show that the party's interest in commenting on matters of public concern outweighs her employer's interest in efficiency; and (4) show that the speech *motivated* the adverse employment action. *Serna*, 244 F.3d at 482. For the fourth prong (causation), the employee must show the protected speech was, as noted, a "motivating" or "substantial" factor in the adverse employment decision; but, if the employee satisfies this burden, the employer is entitled to show that he would have made the employment decision *even if* the employee had not engaged in the protected activity. *Mt. Healthy City Sch. Dist. Board of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992) (applying standard to review JMOL after plaintiff's evidence).

Along these lines, the Supreme Court has stated:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing.... The constitutional principle at stake is sufficiently vindicated if ... an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct.

9

> But that same candidate ought not be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision ..., simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Doyle*, 429 U.S. at 286.

To recover under the Texas Whistleblower Act, TEX. GOV'T CODE §§ 554.001–.009 (TWA), a party must show: (1) a good faith report of a violation of law; (2) the report was made to an appropriate law enforcement authority; and (3) a suspension or termination of employment, or other adverse personnel action, as a result of the report. TEX. GOV'T CODE § 554.002(a); *Serna*, 244 F.3d 479. "To show causation, a public employee must demonstrate that ... the employee suffered discriminatory conduct ... that would not have occurred when it did if the employee had not reported the illegal conduct." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000). Along these lines, in determining this causation standard, the Texas Supreme Court relied upon *Doyle* and cited the above-quoted section of that opinion. *Texas Dep't of Human Servs. of the State of Texas v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995).

Circumstantial evidence may be used to show causation under the TWA. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) a negative attitude toward the employee's report of the conduct; (3) failure to adhere to the employer's policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5)

10

evidence that the stated reason for the adverse employment action was false. *Zimlich*, 29 S.W.3d at 69 (Tex. 2000). Causation, however, cannot be found without *some* evidence. *Id.* at 68. Under the TWA, the employee has the burden of proof; but, if the action is filed within 90 days of termination, there is a rebuttable presumption that it was caused by the report. TEX. GOV'T CODE § 544.004(a).

Generally, Dr. Doyle contends the discharge-reasons given by Dr. Carter are pretextual. On appeal, as in its post-trial JMOL motion, the County contends the evidence was insufficient to support finding causation. (For the TWA claims, the County has presented evidence sufficient to rebut the presumption of causation. *See Texas Natural Resources Conservation Commission v. McDill*, 914 S.W.2d 718, 723-24 (Tex. App. - Austin 1996, no writ) (presumption rebutted when evidence offered showing no causation).)

Dr. Doyle maintains she engaged in three instances of protected activity: (1) her report to Dr. Carter at the 5 January 1998 meeting; (2) her reports to the District Attorney, beginning 9 January; and (3) her 14 January interview with the *Houston Chronicle* reporter. Dr. Doyle failed, however, to brief, and therefore waived, her First Amendment claims for any conduct but the newspaper interview.

11

Dr. Doyle has failed to present evidence sufficient to show Dr. Carter knew Dr. Doyle spoke with the *Houston Chronicle*. "It is axiomatic that a party cannot be 'substantially motivated' by a circumstance of which that party is unaware." **Tharling v. City of Port Lavaca**, 329 F.3d 422, 428 (5th Cir. 2003).

As noted, Dr. Carter testified that she never read the 16 January article. As Dr. Doyle correctly states, the jury is entitled to disbelieve Dr. Carter. Nevertheless, Dr. Doyle must present some evidence that Dr. Carter knew, or believed, Dr. Doyle was the source for the article. For this purpose, Dr. Doyle contends the jury could so infer for the following reasons: the District Attorney instructed Stricklin, his first assistant, to investigate; Stricklin spoke with Garcia, the HCMEO attorney, about an HCMEO doctor reporting that "she" perceived a problem with Dr. Van Dusen; the newspaper article quoted two pathologists, one of whom expressed concern about signing death certificates for Dr. Van Dusen; and only *senior* pathologists sign death certificates.

Combining these facts, Dr. Doyle claims that, because she was the only *female senior* pathologist signing Dr. Van Dusen's reports, Dr. Carter knew the newspaper article quoted Dr. Doyle. Dr. Doyle, however, has not presented any evidence, circumstantial or otherwise, regarding the content of any discussions Dr. Carter had with Garcia. Dr. Doyle's theory is pure speculation. *See* **Tharling**,

329 F.3d at 428 ("notice that unnamed witnesses had lodged complaints ... is not tantamount to notice that [plaintiff] himself made any allegations").

Dr. Doyle also generally claims that a jury could infer Dr. Carter believed Dr. Doyle was the newspaper's source because, prior to the article, Dr. Doyle had stated to Dr. Carter that she (Dr. Doyle) believed Dr. Van Dusen was illegally practicing medicine. She supports this claim with the following two pieces of evidence.

First, Dr. Doyle and two colleagues testified that Dr. Carter's attitude changed toward her after that 5 January meeting. Although this change may be attributed to her report to Dr. Carter, it predates the newspaper article and cannot be used to show Dr. Doyle was terminated because of her subsequent report to the newspaper.

Second, Dr. Doyle contends that, on 16 January, in a staff meeting, Dr. Carter criticized those who spoke to the media and, while doing so, *stared* at Drs. Parungao and Doyle. This one piece of evidence does not create a sufficient conflict to present a jury question. *See **Zimlich***, 29 S.W.3d at 69 ("[E]vidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events"); *see also **Reeves***, 530 U.S. at 148 (discussing sufficient evidence in a Title VII context: "[A]n employer would be entitled

13

to judgment was a matter of law ... if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue [i.e., pretextual] and there was abundant and uncontroverted independent evidence that no discrimination had occurred").

In any event, as discussed below, faced with the overwhelming, uncontested evidence of her numerous violations of office policy, Dr. Doyle has failed to rebut that Dr. Carter would have terminated her *regardless* of her report to the newspaper.

### B.

As for the other two claimed instances of protected activity (reports to Dr. Carter and to the District Attorney), reviewed only in reference to the TWA, Dr. Doyle contends Dr. Carter knew of her report to the District Attorney, using reasoning similar to that above:  the District Attorney instructed Stricklin to investigate; Stricklin spoke with Garcia; Garcia spoke with Dr. Carter; and, therefore, it follows that Dr. Carter knew Dr. Doyle reported. Again, Dr. Doyle has provided no evidence regarding the content of any of these conversations.  Moreover, although Stricklin stated he mentioned Dr. Doyle's name at some point, he noted it was not in his initial discussions with Garcia and could *not* recall when he did.

Further, Dr. Doyle asserts Dr. Carter's reasons for termination are pretext because, directly after meeting with Garcia, Dr. Carter ordered the time sheet comparisons.  Dr. Doyle

14

contends this shows Dr. Carter attempted to set-up Dr. Doyle and create a paper trail.

First, without any evidence of the content of conversations between Dr. Carter and Garcia, Dr. Doyle's contention is mere speculation. Second, Dr. Doyle had ongoing problems in using her security card and properly filling out her time-sheets; the time-sheet comparison was new, but the motivating problems were not. Third, Dr. Doyle ignores undisputed evidence that she was terminated directly after Dr. Carter learned about problems with the Smither autopsy, abuses of toxicology procedures, and inconsiderate comments made to Dr. Doyle's colleagues. None of these events relate to the time-sheet comparison.

In any event, Dr. Doyle also claims Dr. Carter retaliated against her because Dr. Doyle told Dr. Carter that she believed Dr. Van Dusen was practicing medicine illegally. As stated above, she also claims Dr. Carter could infer from this report that Dr. Doyle was the source for the subsequent newspaper article. Again, Dr. Doyle has failed: (1) to rebut the County's uncontested evidence of her many disciplinary problems; and (2) to show that she would not have otherwise been terminated.

First, Dr. Doyle claims the "people in glass houses" comment in Dr. Carter's 9 January memorandum referred to her recent meeting with the District Attorney or Dr. Carter; and Dr. Carter wanted to retaliate against her. That statement, however, was followed by examples of disciplinary problems and mistakes Dr. Doyle had made.

15

It is evident from the context of the statement that Dr. Carter merely wished to point out that Dr. Doyle should not criticize her colleagues when she had so many problems herself. No other reasonable inference can be made.

Further, Dr. Doyle contends that Dr. Carter's summarized statement to the Texas Workforce Commission that she knew Dr. Doyle's termination would "hang over [us] like a whistleblower" evinces Dr. Carter's discriminatory intent. As noted, this statement was made *after* a news article had identified Dr. Doyle as the whistleblower. Dr. Carter's statement shows no more than an awareness that the termination could be perceived as being motivated by whistle-blowing activities; a reasonable inference cannot be made that Dr. Carter *was* motivated to terminate for those reasons.

Dr. Doyle also claims that one of the reasons listed in the termination memorandum — "Your activities outside of the autopsy suite continue to serve only to divide the office" — references her report to the District Attorney and Dr. Carter. In the light of undisputed evidence of Dr. Carter's continued discipline of Dr. Doyle for other activities, there is insufficient evidence for a reasonable jury to infer that Dr. Doyle's termination would not have occurred when it did, if not for reporting to Dr. Carter. This is especially so considering: Dr. Doyle was terminated 18 March, directly after three other events in which Dr. Doyle violated HCMEO policy; and Dr. Parungao, known by Dr. Brown to

16

have possibly reported to the District Attorney, was not terminated or otherwise disciplined for his report.

The evidence Dr. Doyle presents does not create a sufficient conflict, and judgment as a matter of law was, therefore, appropriate. As quoted earlier: "[T]he [marginal or borderline employee] ought not be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a[n adverse] decision ..., simply because the protected conduct makes the employer more certain of the correctness of its decision". *Doyle*, 429 U.S. at 286.

## III.

For the foregoing reasons, the judgment is

*AFFIRMED.*